You may be seated. The clerk will call the next case. 3-4-8-0-5-5-2 SNI Solutions, Inc. v. Mining International, LLC Addressed by Mary Morton Mr. Noe? Please the Court and Counsel. Daniel Hardin and I are here today representing SNI Solutions, Inc., a company which is located in Geneseo, Illinois. It is pursuing in this case two claims against a company known as Mining International, Inc. The two claims are first, loss of its 1,486 tons of de-icing salt. That is discussed in the first two issues in our brief. And the second is a reimbursement for demerge charges which our client incurred due to delay in unloading that salt. That's the third issue in our brief. In the interest of time today, I would like to address that first claim and stand on the brief with respect to demerge. But if the Court has any questions, I'd be happy to try to address those. The first claim sounds in bailment. And as the Court is well aware, that's a special legal relationship where A turns over property to B, B does not return that property, and B is then liable for the value of that property unless it can prove what happened to the property and that it was not its fault. What happened was not its fault. S&I entrusted its salt to Mining International and it was not returned at the end of their business relationship. One issue then is how much salt was delivered to Mining International. Proof of delivery in this case was made by business records. And those were the records of both two companies. Midship Logistics, which was the company that Caterpillar hired to transport the salt from an ocean-going ship in New Orleans, where it came from Mexico, and then move it up the river to different ports, including the Port of Will County in Joliet. The Port of Will County was operated at that time by Mining International. So we had Midship Logistics records about the quantity of salt and also Mining International's own business records. It also established the amount of the quantity of salt. We established through those two records that 15,462 tons of salt was unloaded at the Joliet facility in November of 2009. Over the next year and a half, Mining International stored that salt and then dispersed it as per the business arrangement to our customers as we sold it and we sent trucks up with appropriate paperwork and so on. At the end of the business relationship, the shortage that we experienced was 1,486 tons. In other words, 13,976 tons went out, but that left a shortage of 1,486 tons. At the trial, the judge found, and there was no objection to that by the defense in this case, the judge found that the reasonable value of the salt was $75 a ton. So multiplying $75 a ton times the 1,486 tons that were missing leaves a loss to our client of $111,450. Now at trial, for the very first time, the defense raised a challenge. The fact that they got that much salt. They said, well, they had three arguments. They said, well, the records that were relied on by us and I were not reliable records because the salt was, the amount of salt that was established by the, was established by what's called the draft survey. It wasn't weighed when it was put on the barges. Second, they said, well, there was a metric ton column in one document that they put into evidence, a midship document that had some error in the conversion between metric and standard tons. And they said, thirdly, you didn't produce the bills of lading. So those were the three arguments. I'd like to point out why those arguments have no validity. First, as to the draft survey, and it should explain to the court very briefly, the draft survey is an engineered calculation. In other words, there's a formula for looking at the barge, how deep does it sit in the water when it's loaded, and you make a calculation based on the size of the barge, the depth that's in the water, and so on. It was established and undisputed at the trial that that is an accepted way of determining quantities of material in the shipping industry. Also, it was determined that that is very close to scale weight. In other words, draft survey or draft is very close, so it's basically the same thing. So there's no merit in that defense that was raised. Secondly, they said, well, there's a metric ton problem here. And this argument seemed to confuse the trial judge. He spent a lot of time analyzing this and looking at this. He made a color chart trying to figure out why the metric ton column didn't jive with some of the other records. This was on Exhibit 24. Well, the problem with that defense for Mining International is threefold. First, there's no dispute, as even stated in their brief, no dispute that this was a business transaction between S&I and Mining International that was all being done on standard tons. Nobody was using metric tons. I think metric tons had been used by Caterpillar when they bought the shipload from Mexico, but that was the end of metric tons. As far as our transaction was all standard tons. Well, if you convert metric, I mean, you know, and go to a dictionary and get measures and weights, a standard ton is a short ton. Yes, that's correct. Did the metric number match a short or standard ton? Well, it was not. Everybody else uses metric. Well, that's true. It's certainly coming from Mexico. From Mexico. From Mexico, you would understand that. You can see, Your Honor, that if you look at it, what they did was they divided instead of multiplied. In other words, they used the same factor, the 1.1023 is the conversion factor. Somebody multiplies, that way they should have divided. Basically, that document, however, had nothing to do with the business transaction between S&I and Lightning International. But it does go to the amount, doesn't it? I mean, because if it's listed as metric tons, you know, I'm saying that the metric tons, they're listed as greater, right? And that's what they were listed as. That's opposite of the proper conversion. That's right. Standard tons are more of a metric. So, you know, if somebody did miscalculate and put the wrong conversions, wouldn't that throw everything off? No, not really, because if you look at the ETA, or look at the standard tons on that document, which is kind of an outlier document, number 24, but you look at the standard tons on the ETA, the ETA is called, those are estimated time of arrival documents. They were also midship documents. In other words, midship sent those to Mining International saying, here's when we estimate we're going to get there with the barges. So you look at the standard tons on Exhibit 24, look at the standard tons on Exhibit 2, which was the ETAs from midship, and then you look at the Mining International document, which is 3. All the standard tons are all consistent throughout. And here's the other point, Justice O'Brien. There is no dispute that they got the standard tons because the conversion would be bigger. To use an example, let's say that I said that I was going to, A said I gave the defendant $500, and the defendant says, no, I got $1,000. Well, there's no dispute. I mean, it's against the manifest way. The evidence says they didn't get $500 because it's bigger. It's a greater amount. In other words, that metric ton mistake would show more weight, more salt coming in. There was never any evidence that they got less than 15,462 tons. Well, this case is a shortage case. Yes. Not an overage case, but a shortage case. We were shorter. Right. Here's your point, anyway. Yes. That's right. And the point is that if you look at all the documents on standard tons, which is what this business transaction is on, they're all the same. And they all establish the 15,462. If you use that one document that has the mistake in it about the metric tons, you have thus them getting more salt, even more salt. So they can't use that as a reason to say we didn't get properly metric. If you assume what your argument is, if you assume that metric was the proper measure and the metric was the accurate measure, and you convert that back into standard or short tons, there's more standard or short tons. That's correct. So I'm saying that if you take their argument that, well, look at the metric tons, well, then they got more than 15,462 short tons. What were they paid for unloading? Pardon me? What were they paid for unloading? Didn't they rely on the 15,000? Yes. And they offered to reimburse? No, never. They charged us $2.50 a ton, Your Honor, to take it off. And they charged us $2.50 times 15,462. And they relied on the same document? Yes. They said, well, we relied on the ETA, the document that came in. And so we – but they never offered us – this came up at the trial. This was a trial argument. At no time did they ever say, well, okay, then we owe you a refund. So it's – so then that's turned to the bills of lading argument. They say, well, there was a dispute whether they were or they weren't furnished. And they never specifically said, well, we asked for these in discovery and we never got it. And because, again, this was something that was a trial argument. The point is bills of lading weren't needed to prove the amount delivered because in this case we introduced the ETA, the midship document. We introduced Mining International's own itemized statement, which charged us $2.50 a ton. These were uncontradicted business records, and therefore they're presumptively accurate under Illinois law. Since they weren't contradicted by substantial evidence, we weren't required to put on more proof. We just had to prove this case by the greater weight of the evidence. And they would argue, well, you didn't bring in the people who loaded it down in New Orleans. You didn't bring in the bills of lading. We didn't have to make that kind of proof when we put on uncontradicted business records that had no substantial evidence to say they weren't valid. We discussed those cases on pages 21 and 22 of our briefing. The one I'd like to mention here today, because it's so close to our case on the facts, is that coupon redemption case. In that case, the plaintiff sued the defendant for supplying coupons that weren't honored by the manufacturer. The judge, and they introduced chargeback sheets, or summary sheets of all those things where they didn't get these honored. The judge let that summary sheet come in, but then he said, well, I'm not going to give it any weight. I'm not going to consider it, because you did bring in the actual notices from the manufacturers, and there were some inconsistencies in that sheet. And on appeal, the court said, no, the trial judge could not do that. He committed error because there was no substantial dispute about that record, and it should have been enough to carry the day for the plaintiff. Additionally, I would just say real quickly that after this loss was brought to their attention, they produced something called a reconciliation sheet, and again, they used 15,462 as the incoming number. This was after the fact. This is a mining international, and they testified that was accurate, and they tried to explain away their loss, and they got it down to 700 and some tons by a lot of things that we discussed in the brief were not valid arguments, including the fact that they admitted finally that they sold 92 tons of our salt and didn't pay us. Finally, on reconsideration, we did get that from the judge, but he didn't give us anything else. That was at the rate of $75 per ton. Did anybody argue the proper measure of damages? Because I'm guessing they sold it for more than $75 a ton. I imagine they did, but we put on evidence that was 70. Well, actually, Judge, they sold it, some for $65, some for $75, and some for $85. We got those records. So Judge Zimmer said, well, $75 is accurate. Finally, I'd like to conclude because I know I'm running short on time. Talk really briefly about the second error that I think was made by the trial judge, and that is after a bailment, once you get it into their hands, then they have to prove two things. They have to prove what happened to it and that what they did didn't cause that to happen. In other words, it blew into the river in a tornado, and nothing we did caused that. I mean, that would be a defense. In this case, what Buying International did is they said, well, we had it in a fenced area, and there were Homeland Security people on the next property, so they would probably watch over and look and see if anything untoward was happening. That's not enough. I mean, we gave you the cases on pages 31 and 32 of our brief, and that James Coates Motors case, I think, again, is real close. The defendant left the plaintiff's car in a fenced and a guarded lot. Then they didn't return the car. They said, well, like they said here, we were reasonable. We put a fence around it. We put a guard there. And the court said, no, you can't simply say that you did that unless you can show what happened. You didn't prove how the car disappeared. In this case, they didn't prove how the salt disappeared. Well, what you're saying is it's a burden shift. Yes, sir. And so the defendant, in this instance, you're saying it was sufficient, which he put on to shift the burden, to say no negligence, that through no fault of our own, this was not returned. Well, yes, sir, and the reason for the rule endowment is once you give that property over, you don't know what's going on. Well, the argument is that Bailey is the one who's probably in the best position to know what likely happened or didn't happen. Right. That's the whole theory. And that's why the burden shifts. It shifts. Exactly. So in conclusion, I would say, Your Honors, that while the trial judge did finally, on reconsideration, give us the 92 tons that they admitted that they took. 92 or 97. 97 tons. I'm sorry. Thank you. He gave us the value of that because he said, well, I guess they did admit that they sold that, didn't tell you they were selling it, and admitted they never remitted the money to you, so I will give you that, but he denied the rest of our relief, and I think that certainly we were entitled to the $111,000. Even on their reconciliation, that number comes up to $55,650, and we didn't get that. So we would believe that this is against the manifest way of the evidence and ask for recovery of that amount plus the demerit. Any questions that I can answer? Thank you very much. Mr. Zitmorski. Good morning. Thank you. You may proceed. Thank you. May it please the Court, Mr. Noe, my name is Barry Morgian. I represent Mining International. And I just want to talk for a minute about the standard of review in this case. And the standard of review in this case is whether the trial court's judgment was against the manifest way of the evidence, and in order for S&I to prevail in this matter, it must demonstrate that the trial court either ignored the evidence or that the measure of damages was erroneous as a matter of law. And simply because a reviewing court may reach a different conclusion than the prior fact is insufficient to warrant a reversal. And I think if you look at Judge Zimmer's very lengthy ruling on the record, it's very, very apparent that he considered all of the evidence in the case and has sufficient basis for his ruling. We all know what the standard is for a bailment case. And there are two problems with the plaintiff's case in this matter. They never produced a single witness with direct knowledge as to how much salt was delivered. Mr. Belovitz, who is the president of S&I. Why isn't the business record of how much your client charged to unload it relevant? It is relevant, but it's not presumptive. It's relevant. It's a business record, a billing record from your client. It's a billing record from my client, but it was taken from information supplied by the plaintiff's vendor. Did anybody prohibit them from weighing it as they unloaded it? No, but it was not the contractual responsibility under the contract that S&I drafted for us to weigh it when we received it. And under a contractual bailment case, we were only charged with the duties under that contract. We were not responsible under the written contract drafted by S&I to re-weigh it when it came in. We were simply to offload it. We were supposed to then charge, I think, $250 a ton for the offload. Was there a valid contract when it was delivered? Yes. It expired during the bailment? The express term expired after the salt was delivered. And then by agreement of the parties, it was extended orally for a certain amount of time until my client needed the space for other clients. There was no claim by your clients about the difference in terms of offloading. I mean, obviously, the implication being is there was less salt there than what you were being paid to unload. I'm sorry, I don't quite understand that question. I think I understand you to say that your theory of the case might be, or factually, there was less salt there on that barge than what you unloaded. Right, and apparently what happened was that there was less salt on the barges than what the documents stated. Did you remit that difference on the unloading payment? No, and I understand there were questions about offering. So what happened was when the discrepancies came to light and my clients presented the reconciliation record, my clients, Mr. Brawley testified at trial, kept asking for records so he could further investigate where the shortage could be. You know, send us the bills of lading, send us all the documents from midship, send us the draft rate, send us whatever you have, and instead, S&I filed suit. During this reconciliation, was there remission by your client that they had apparently let some salt out unbeknownst to S&I? Correct, correct. So what happened was, and this was testified to at trial by the parties, that there was e-mail traffic and there were e-mails in the record where people would call mining and say, you know, we see you have some salt, would you be interested in cash sale? And there's e-mail traffic between Mr. Brawley and Mr. Belovix who says, how much would you ask for for a particular quantity of salt? And the difference in the quantity for sale depends on the amount of the bulk. So if you look at the record, there were e-mails where Mr. Belovix said, well, we would be seeking $63 a ton for this amount, $75 for that amount, or a different amount. So what happened was, and Ms. Weitzel testified on behalf of mining in this regard, that there were hundreds, and if you look at the record, there are hundreds and hundreds of salt tickets that were generated as each one went out, that what happened was that the salt tickets for what we call the cash sales originally were not remitted to S&I. And again, you know, it sounds somewhat nefarious to say, well, they didn't pay them, they didn't do this, they didn't do that. There's a whole lot of conversation going on once the discrepancy was discovered, and instead of working it out, S&I filed suit. So that cut off all settlement discussion. And that's why we're in the posture that we were. But the problem is that they did not establish that any witness who weighed, transferred, or otherwise was responsible for the salt who came and testified how much salt was actually delivered. So yes, the business record is relevant and can be considered, but as the testimony was, you know, a draft weight depends on certain calculations, and there were no certifications tendered into evidence by the plaintiff as to what those certifications were. So without that, when you have... What do you mean by certifications? So what happens is, as was testified to a trial by everybody, that a draft weight is a measured weight. And they look at markings on the barge as it sits in the water and there's a displacement. And there's a unit of measures that they have to use, but there was no testimony as to what those were. Nobody from S&I or any of its vendors who were responsible for the weighing and transferring and shipping ever testified, yes, we took 47,495 metric tons of salt, we distributed them to these different barges, we re-weighed them, and here are the measurements. There was no testimony about that. And it was incumbent upon the plaintiff to do that. But did you... I mean, did your client dispute that... how this had been conducted, the draft survey, in this circumstance? Because... We couldn't contest it because nobody ever gave us any information on it. You know, we subpoenaed records from Caterpillar. They didn't have records on it. You know, Mr. Jackson testified. But it wasn't our burden, okay? It wasn't our burden. They have the burden of showing how much was delivered. And they were never able to successfully show that to the trial court satisfaction. And you don't think they proved how much was unloaded by relying on your billing records? That's correct. Because all the billing records did was parrot the email. And the creator of the email did not testify at the trial. And because we then discovered that there were midship records that were in conflict with the email, then all of the numbers were confusing. And that's what the trial court found. What's the conflict? I know what the trial court found. But what's the conflict here that you're pointing to? The conflict is that the... We have the metric ton problem? The metric ton problem. And no one testified how the metric ton measurements were put into the chart for each barge. No one testified as to how the calculations were made for each barge. No one testified as to why there was a discrepancy in the one chart showing metric tons greater or lesser in one than the ETA email that was sent, that was the final document sent. So there was no foundation for how any of these measurements were obtained. Okay.  If you look at the metric tons and convert it back into standard tons, that metric number is larger than the standard tons. Which begs the question of that there seems to be an error somewhere along the line in calculations. Oh, okay. So because there's an error that might arguably favor you in terms of overage, okay, that you actually got more delivered than that standard ton figure, then we can't believe the standard ton figure either. Well, we can't believe any of the tons. We can't believe any of them because no one has testified where they were derived from. No one testified as to where they were derived from. But even going beyond that, let's just assume that the court finds that the trial court was an error on that issue. Okay. Then the burden shifted to us to show that we were free from negligence. And we showed that because, first of all, the witness who unloaded, who was called by the plaintiff, Pat Shea, testified that every single drop of salt was unloaded from the barges. And there was testimony from him and from Mr. Brawley that if you leave any amount on the barges, then the barge company charges you back for cleaning it. So there was no evidence that any of the salt was left on the barge. The testimony was that the salt was kept in a segregated area. And, mind you, Mr. Belovix testified that he came to the site on several occasions and noticed that his salt was kept segregated from other product and that he had absolutely no complaints regarding the storage of the salt. There was testimony regarding the methodology used to take the salt from the piles to the conveyors to the trucks. Each truck that went out had a weight ticket. And what's very interesting is that everybody agrees, everybody agrees, that the weight tickets issued by my client were accurate. Mr. Belovix testified that none of his clients ever came to him and complained that any of those measurements were an error. So the one measurements that we know are absolutely correct were the truck weights made by my client. In addition, my clients testified that during the time that the salt was stored at their site that... Well, how do we know that they were accurate? I mean, all we know is nobody complained about it. Well, if the other weights are going to be presumptively accurate, then these are as well. Because I got news for you. If Mr. Belovix was going to complain about a shortage of delivery, he was going to complain about a shortage to his clients. And what's even more is that the final delivery from when my clients asked that they remove all their salt, the salt of 4,343 tons were delivered to Ozinga Materials. And those, in fact, were re-weighted at Ozinga. And Ozinga testified that our measurements were correct. So there was proof that our measurements were, in fact, correct. There was also testimony that the keys to the equipment are locked up every night, that there is a gate that's closed at night so no one can come in, that there were sufficient security measures taken so that nobody could use the equipment to start taking salt. So there was no way that anybody came in and took salt from the piles and then stole them and did something else with them. So we came forward with evidence that we were not negligent in the handling and storage of the salt, and that's what the judge found. And once that happened, the presumption of the delivery and the presumption of negligence is gone. Just for clarification, were the 97 tons, were those accounted for in the weight tickets that were presented at trial? Yes. Okay. So it was just the payment that was not clear. Correct. Okay. And Ms. Weitzel testified because of the volume of salt going out, she just neglected to, along the way, to take care of the remittance. But there were records of it, and the weight tickets were introduced into trial, and there was no disputes to those amounts. Can you explain the reconciliation to me? Did you agree there was 742 tons that was not accounted for? So if you take the amount claimed by S&I and you deduct the amounts that were delivered on the weight tickets, and then you account for the shrinkage factor in the industry, okay? Which you calculated 3%. Correct. Then there was a potential loss of 742, but that's assuming that the entire amount was delivered. Which you did make that assumption. Only for purposes of the reconciliation, because that's the only information we had at the time the reconciliation was made. You have to remember the information from midship with all these conflicting records was not available to us at the time. And again, the reconciliation was done at a time when we were trying to find out where the problem was. They were trying to account, so they took the number that was presumed, because that's the only number that we had, and then did the calculations on the reconciliation after. But if the number of 15,000 is wrong, then the balance number is wrong. So you don't consider that an admission that there was 742 unaccounted for? No. Well, but you used the same number when you billed S&I for offloading it in the beginning. That's because that's the only information we had, and we were not obligated to independently correlate what they provided, because that's not what our contract stated. But again, once you get past the fact that we presented evidence that we were not negligent, then the burden then falls back onto the plaintiff to come forward with evidence that we were negligent in the handling of the assault that caused the loss. And they produced absolutely no evidence of that. There was no evidence. In fact, Mr. Belovix testified that he was satisfied with the way that the assault was handled and stored. So once that bubble of presumption is gone and burst, as the Wright v. Autohouse case says, then it was incumbent upon them to come forward with evidence by preponderance of the evidence that we were negligent in the handling of the assault that caused the loss, and they did not produce a single iota of evidence in that regard. So at the end of the day, they cannot prevail in their case. Any questions? No. Thank you, Mr. Morici. Mr. Noe for rebuttal. Thank you. Mr. Morici just made an argument about the fact that we didn't do more. We didn't prove things beyond these business records. We didn't have the people from the dock in New Orleans to say just how did they calculate this draft survey weight and so on and so forth. Well, the U.S. Supreme Court has spoken to this. This is why we have the business records doctrine. And we cited on page 7 of our brief the Palmer v. Hoffman case where the court said unless business records can be used in court without the task of calling those who at all stages had a part in the transactions recorded, nobody would ever pay a debt. Only if his creditor has a large enough business. In other words, if you have to call everybody, then we don't have any reason to have a business records rule, and we have a business records rule. And I've cited in my first argument the fact that these are presumptively accurate and that they didn't do anything to rebut that presumption. The best they did was bring in some stray record from midship logistics where somebody made a mistake on one column of metric conversions. But it had nothing to do with this case because everybody has agreed this was a short ton or a standard ton case. And everybody knows that they were all consistent, even that stray record. And the ETAs and their own billing record, everybody was consistent on the standard ton calculation and the standard ton charge to us. Here's what Mr. Morton is saying is that, you know, they come in, they're presumptive, but if there is a doubt about any accuracy because maybe somebody says, well, I didn't double check these or whatever, like they're saying, they didn't with the wait tickets when they arrived because that wasn't part of their contract. Well, then doesn't that sort of make the accuracy of those wait tickets maybe an issue that, you know, could reduce the credibility, not the admissibility, but could reduce, you know, the court's reliance on those. Which would then require that you do bring in some of those people. That would be true, Your Honor, if there was any inconsistency in the standard ton weights. But there wasn't any. Every record, as I say, the stray record, Exhibit 24, the ETAs and the Exhibit 3, which was their billing record desk, every single record was absolutely consistent on the standard tons. And as I pointed out before, even the metric ton mistake would indicate they got more than 15,462 tons. So they can't really rely on that. That doesn't help them argue that they didn't get enough. That would say they got more. So I think that the basic argument that he just made has a fallacy in it, and that is that it would say that business records really have to go back behind the business records so everybody's involvement could lead up to that billing record. As I said before, it was uncontested at trial that draft survey is what is used in the shipping industry. Everybody relies on it. The other thing I'd like to say is that these records were admitted without objection. I mean, all these records came in without objection. And Mr. Jackson testified about the basis for these records. He was the Caterpillar representative who was evidence deposition and made part of the record. As to the reconciliation, I think now he tries to move away from that by saying, well, it's all we knew. But it was their record. And their person, Wendy Wetzel, their financial person who testified, said, when I did that record, I relied on the records and they were all accurate. So their own admission is for this shortage of the 747 tons that they admitted that they couldn't account for. And that included the 92 tons that they just sold. And while he says there was email chatter about how much should we charge, it's admitted that they never told us that they were going to sell this 97 tons or that they were going to keep the money. So that didn't come back until the motion for reconsideration. Well, did the contract, did it not specify you had to get approval by S&M to make those sales outside of S&I? Yes, they were only to disperse with approval by us. Right, so there was not approval. And there was not approval. And he just made a lot of arguments about straw men that he could set up and knock down. The things that were never in dispute, he talked about, well, we kept it in a segregated pile. We were very diligent in the way we dispersed it out. In other words, we would sell some salt to customer X. Customer X would get a number. We would call them with the number. X would have to come in with his truck and show that number to them in order to be able to get X number of tons of salt. All that was handled properly. But that's not the dispute. The dispute in this case isn't about the 13,000 that went out. What they're trying to dispute belatedly and at the trial for the first time is that they didn't get the full 15,462 tons. But the precondition of the evidence is certainly that they did. And that it was against the manifest weight for the trial judge to find otherwise. Finally, the last point I'd like to make is about the standard review. It is a manifest weight of the evidence case as to the delivery issue. But as to the fact that what they have to do to shift the burden back, that's a de novo review. Because what they're arguing is that all they have to show is we put it in a fenced area. We had some harmless security people. We took the keys and put them in the office or something like that. The issue that's de novo is we believe that the Illinois law says, and it's in our briefing, I cited the James case, the Coates case earlier. They have to show first what happened to it. They never showed what happened to this salt. They didn't say it was stolen. We know that 97, all their security measures didn't keep the 97 tons from going out the door because they admitted what happened to that. But all of this didn't, they have to show first that if it's going to be anti-theft, that it was stolen. And who stole it? They never showed that. So missing that, they didn't shift the burden back and that finding otherwise was there. Thank you, Your Honor. If you have any questions. Thank you very much for your time. Thank you both. Thank you all of you for your arguments here today. This matter will be taken under advisement and a written decision will be issued as soon as possible.